### BEN DAVIS v. THE STATE.

#### No. 4500. Decided June 6, 1917.

#### Rehearing denied June 27, 1917.

**1.—Murder—Self-defense—Charge of Court—Theft.**

Where, upon trial of murder, the evidence showed that defendant was in the act of stealing in the night-time, he could not rely upon self-defense, although the owner hailed' him and even shot at him; however, the court submitted self-defense in his favor, and there was no reversible error; besides, the defendant did not except to the court's charge at the time or ask for special instruction.

**2.—Same—Manslaughter—Charge of Court.**

Where, upon trial of murder and a conviction of that offense assessing the death penalty, the evidence did not raise the issue of manslaughter, there was no error in the court's failure to charge thereon; besides, defendant did not except to the court's charge on this ground.

**3.—Same—Imperfect Right of Self-defense.**

Where, upon rehearing, the appellant contended that although he was caught in the act of theft, that deceased shot at him or somebody with him

before he shot deceased, and while defendant was running away, and that the court should therefore have instructed on manslaughter, yet the record showed that the court charged on perfect self-defense in a manner more favorable to appellant than was justified under the law and the facts, there was no reversible error. Following Young v. State, 53 Texas Crim. Rep., 416, and other cases. Besides, no exception was taken to the court's charge.

#### 4.—Same—Rule Stated.

The submission of the appellant's defensive act to the jury in a light more favorable than the law required does not make the failure to submit it with a limitation, reversible error, or condemn the trial for fairness and impartiality, and there is no reversible error.

Appeal from the District Court of Washington. Tried below before the Hon. R. J. Alexander.

Appeal from a conviction of murder; penalty, death.

The opinion states the case.

*Mathis, Teague & Mathis,* for appellant.—Upon question of imperfect right of self-defense: Reed v. State, 11 Texas Crim. App., 514; Franklin v. State, 30 id., 629; Franklin v. State, 34 Texas Crim. Rep., 288; Young v. State, 53 id., 410; Carter v. State, 3 Texas Crim. App., 557; Peter v. State, 23 id., 687.

*E. B. Hendricks,* Assistant Attorney General, for the State.

PRENDERGAST, JUDGE.—Appellant was convicted of murder with the death penalty assessed.

There is no necessity of reciting the testimony of the several witnesses. However, it was clearly sufficient to show, and authorize the jury to find that shortly before the night of July 8, 1916, John Davis, a brother of appellant, and Charley House had stolen a large number— fifty-seven—watermelons out of the field of Frank Wehmeyer, and hid them in the bushes and grape vines in Mr. Buck's hay field. That Mr. Wehmeyer had discovered that his melons had been stolen, and after searching found them where they were hidden, and thereby recovered their possession; that he then procured the assistance of several other persons, and together they went to Mr. Buck's field where the thieves had secreted the melons on Saturday night to apprehend the thieves when they would come to regain and remove the melons. They were armed, but not for the purpose of killing the thieves, or any of them, but to catch them. They remained near where the melons were until about 2 or 2:30 o'clock that night. The moon shone until nearly that time but had gone down and it was dark thereafter. After it got dark at said hour of about 2:30 o'clock in the morning, appellant with his said brother and the other thief and another party together went to get and haul away the melons. They went in a two-seated hack. They had sacks along with them to get the melons and carry them to the hack. When they got near the place they all got out, hitched their team, and with the sacks went to get the melons. Appel-

lant shortly before this had procured his gun and took that along. When they got out of the hack he took this gun with him to get the melons. He with his companions were discovered by deceased and his associates going to get the melons, and just as appellant reached the melons and stooped down to begin putting some of them in a sack, the deceased called to him and the others two or three times to "hold up, that they had stolen the melons but had not gotten away with them, and to hold up, we got you." Deceased and two of his companions were at this time very near to appellant, the testimony showing that he was within six to ten feet of him. Appellant replied, "Got hell," and immediately shot and killed deceased. That when he fired the first shot which killed deceased he and the others ran. Then deceased's companions repeatedly shot, but not at first to hit or kill appellant or any of his companions. They all escaped at the time. Appellant was so close to deceased when he shot and killed him that deceased's clothes were powder burned. Appellant knew before he got out of the hack and took his gun and sack along with him to get the melons that they had been stolen, and with this knowledge he went to get them, and was in the act of putting some of them in a sack to carry away when he was so hailed by deceased.

Our statute (art. 1105, P. C.) provides that homicide is permitted by law when inflicted for the purpose of preventing the offense of theft at night. If when the killing takes place (1) it reasonably appears by the acts or words coupled with the acts of the person killed that it was his purpose and intent to commit the theft; (2) while the person killed was in the act of committing the offense of theft, or after some act done by him showing evidently an intent to commit such offense; (8) and the killing is justifiable while the thief is at the place of the attempted theft, or within gunshot thereof. So that if deceased had killed appellant under the circumstances he unquestionably would have been justified in the killing. Under this statute the deceased was clearly within the law in attempting to apprehend the thieves, and in hailing them. Even if he or any of his companions had first shot, or shot at appellant, that would give him no right to kill deceased, and his claim of self-defense would not avail him. For if an armed thief at night caught in the very act of theft could defend on the ground of self-defense because the owner hailed him, or even shot at him, it would be in direct conflict with and nullify this statute.

The court, however, submitted self-defense in his favor on his testimony to the effect that he was shot at first, to this effect, that if the deceased, or the others acting with him at the time of such shooting, first shot at the defendant with intention to kill him, or inflict upon him serious bodily injury, then he had the right to shoot the deceased, and he would not be required to retreat in order to void the necessity or apparent necessity of shooting the deceased, and if the jury so find they will acquit him; and further, in passing upon this matter of self-

defense, the jury must do so from the standpoint of defendant as it appeared to him at the time.

Appellant in the trial court, before the trial was concluded, made no exception whatever to the court's charge, and asked no special charge at all. He now contends that the court erred in not charging self-defense in his behalf on apparent danger. Even if we could now consider such question, we think the evidence did not raise, and the court did not err in failing to charge on any such issue. He charged on self-defense from the only standpoint which could be contended was raised by the testimony.

After the trial he contended that the court erred in not charging the law of manslaughter. Even if the evidence did raise such an issue, the court did not err in failing to submit a charge on that subject, because he did not at the time except to the court's charge because of such failure, nor ask any charge on the subject, and under the circumstances of this case no reversible error is shown.

The evidence was amply sufficient to sustain the verdict.

The judgment will, therefore, be affirmed.

*Affirmed.*

## ON REHEARING.

### June 27, 1917.

PRENDERGAST, JUDGE.—Without a review of the evidence, which is stated in some detail in the original opinion, it shows, from the State's standpoint, that appellant while armed with a shotgun went at night to the deceased's premises to steal his property or assist in the theft thereof, and that as soon as deceased, who was on watch, spoke to appellant, appellant shot and killed him. Deceased learning that his melons had been stolen and hidden, went with his friends to the premises to catch the thieves. The State's evidence is to the effect that when appellant and others engaged in the theft appeared, deceased said, "Hold up, you got the melons, but you didn't get away with them; we have got you." Appellant said, "Got hell," and fired immediately. The deceased was armed with a shotgun. A State's witness says, "He had his gun in one hand, in this hand (indicating) under his arm. Just as the gun fired he had his gun up like that (indicating), catching his gun up when the gun fired." The same witness was cross-examined and asked this question: "You say positively that Wehmeyer did not raise his gun, or make an effort to shoot, until after Ben raised his gun? A. No, sir; he didn't raise his gun. Ben says, 'Got hell.' When he said that he was coming up with his gun. Just as he said that his gun fired." Other witnesses for the State give substantially the same testimony as that quoted above. The State's witness Roese testified that deceased said, 'Oh, yes, we have got you now." That at the time he said, "We have got you now," appellant shot. He did not more than speak that word when appellant shot him. Deceased did not try to shoot them in any way. He had a gun; "the position he

held it in was down that way (indicating), like a man walking up, and would have the gun down that way, bending down." The same witness on cross-examination was asked: "Do you know whether Wehmeyer was making any effort to shoot, when he got shot? A. No, sir; he could not shoot. He did not have his gun in position at all if he wanted to shoot." Deceased's clothes were powder burned.

Appellant's theory and evidence was that when he discovered the deceased he ran and deceased, or someone in his party exclaimed, "Hold up, too late to run, I will kill you," and that a shot was immediately fired at him while he was running, and that after he had been shot at he returned the fire. Before shooting he ran some distance, stumbled and fell, and fired without taking aim or shooting at anyone in particular.

The court in his charge accorded the appellant the perfect right of self-defense predicated upon his testimony and theory, namely, that he was fired at by the deceased, or some of the party with him, before he shot the deceased. This charge while not in approved terms was more favorable to appellant than was justified under the law and facts. At most he was entitled, if his theory is believed, to the imperfect right of self-defense. Reed v. State, 11 Texas Crim. App., 514; Franklin v. State, 34 Texas Crim. Rep., 288; Young v. State, 53 Texas Crim. Rep., 416. That is to say, if the jury believed his theory to be true, they would have been authorized by the law to convict him of manslaughter, but would not have been authorized to acquit him.

The charge on self-defense was predicated upon the only defensive facts that were in the record, viz., that appellant upon discovering his adversaries retreated and fired only after he had been fired upon. The charge of the court presenting this theory, and omitting any reference to manslaughter, was examined by appellant's attorneys and permitted by them without complaint to be read to the jury.

The case of Franklin v. State, 34 Texas Crim. Rep., 288, is not understood by us as holding that a man caught in adultery and assailed slays the injured party, is guilty of no greater offense than manslaughter, but it holds that the wrong committed by an adulterer does not completely take away his right of self-defense, and while it may not justify the killing of his assailant, the jury should be told that, believing his theory, they will be authorized to mitigate his offense and convict of manslaughter. In this case the same is true. The court would have been correct in telling the jury that, believing appellant's theory, they were authorized to convict of homicide of the degree of manslaughter, but the court did more; he told the jury, that believing appellant's theory, they would acquit him of any offense. In the trial of the case appellant had the benefit of an instruction that the jury should acquit if they believed his story or had a reasonable doubt as to its truth. Content with this charge more favorable than the law authorized, appellant submits his cause to the jury. After the verdict is it sound to say that by submitting his defensive facts in a light more

favorable than the law justified, and in failing to submit them in their less favorable light, there has been a failure to accord appellant such a fair and impartial trial as will require this court to set aside the verdict rendered? Article 743, Vernon's C. C. P., provides: "Whenever it appears by the record in any criminal action upon appeal of the defendant that any of the requirements of the nine preceding articles (arts. 735-742) have been disregarded, the judgment shall not be reversed unless the error appearing from the record was calculated to injure the rights of the defendant, or unless it appears from the record that the defendant has not had a fair and impartial trial, and all objections to the charge, and on account of refusal or modification of special charges shall be made at the time of the trial."

We are not called upon to consider any of the errors mentioned in this subdivision of the statute, because there were no objections to the charge, and there are no bills of exception, under article 744, C. C. P., pointing out errors in the trial. These are necessary. See notes, arts. 743 and 744, Vernon's C. C. P. Looking alone to the fairness and impartiality of the proceedings, we are confronted with the question above put, does a submission of appellant's defensive facts to the jury in a light more favorable than the law requires, and the failure to submit it with a limitation upon his rights required by law, condemn the verdict as resulting from unfairness or impartiality? Bearing on this question is a long list of cases referred to in Vernon's C. C. P., p. 509, note 20, to the point that a complaint of a charge more favorable than authorized by law is not ground for reversal. It seems to us, in considering the record that if the jury had been told that, believing appellant's defensive theory, they could find against him no more than manslaughter, he could have received no greater benefit than if the jury was told, as it was told, that believing the same facts they were to acquit him. As a practical matter either charge has a tendency, under all the facts, to give the jury an opportunity to mitigate the punishment, and the charge given was quite as useful for this purpose as would have been the charge on manslaughter, because both would have depended upon the same facts. The result of the trial indicates that the jury did not believe defendant's theory; that it did not raise a reasonable doubt in their minds as to the accuracy of the State's theory, to the effect that the appellant, while so close to the deceased his clothes were powder burned, shot the deceased before appellant was fired upon or any effort was made to fire upon him. This court can not say that the trial was illegal, nor that it was unfair or not impartial. The fact that this court might have rendered a more merciful verdict on the facts would not bring it within its province on that account alone to set aside the verdict of the body which under the Constitution is authorized to fix appellant's punishment.

The motion is overruled.

*Overruled.*